## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

ARTHUR BELL,

              Petitioner,                         Case Number: 2:06-CV-15086

v.                                             HON. ARTHUR J. TARNOW

CAROL HOWES,

              Respondent.

_____/

## OPINION AND ORDER CONDITIONALLY GRANTING
## PETITION FOR WRIT OF HABEAS CORPUS

This matter is before the Court on Petitioner Arthur Bell's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Bell challenges his convictions for first-degree felony murder and possession of a firearm during commission of a felony. The Court finds that the state court's decision regarding Bell's *Brady* claim was an unreasonable application of Supreme Court precedent. The Court further finds that trial counsel was ineffective in failing to present alibi witnesses and the state court's conclusion to the contrary was an unreasonable application of Supreme Court precedent. The Court grants a conditional writ of habeas corpus.

## I. Facts

Bell's convictions arise from the shooting death of William Matthew Thompson in the City of Detroit on September 22, 1988. Thompson died from two gunshot wounds to the back and two blunt force injuries to his head.

Priscilla Matthews testified that she was Thompson's girlfriend. Thompson was a drug dealer who worked for Bell's co-defendant Bobby Mims. Mims suspected Thompson of stealing drugs from him. Matthews testified that, on September 22, 1988, she was staying at a motel room in the Grand 20 motel in the City of Detroit with Thompson. She had been with Thompson at the motel since approximately 3:00 a.m. that morning. At approximately 7:00 p.m. she called her sister to check on her son. Her sister told her that three men had been coming over to the house looking for Thompson and her. The three men were "Oddie," "Mark," and "Chill." Matthews identified Bell's co-defendant Mims as "Oddie," and "Mark" as Mark Sylvertooth. She testified that the man she knew as "Chill" was not in the courtroom. She called the house again at 10:00 p.m. and spoke to her cousin, Thomas Boyd. Boyd informed her that the three men kept coming over and threatening to kill Thompson because he had stolen drugs from them.

Matthews testified that a little later that evening she and Thompson were watching television when the door of the hotel room was kicked open. She testified that Sylvertooth entered the room carrying a gun and a meat cleaver. A man she knew as "Chill" entered with a gun in his hand. The two men carried Thompson naked from the hotel room, shoved him in a car, and drove off. When Thompson was being thrown into the car, she was standing in the doorway of the motel room and she saw Sylvertooth, "Chill," and Mims by the vehicle. The car then sped away.

2

Matthews called 911. After she did so, she heard a vehicle drive into the parking lot. She went to the motel room door and saw Mims. He summoned her downstairs. She went because she feared she would otherwise be shot. Mims was standing outside the vehicle. He had on a light-colored suit that had blood spots on it. He was also carrying a handgun. Mims asked her where the missing drugs were. As he was questioning her, "Chill" ran past her and into the motel room. "Chill" was only up in the room for a few moments. Matthews concluded that he found what he was looking for because he returned quickly and Mims and "Chill" got back in the car and drove away. As the car was leaving, she recorded a license plate of 046HF. (The vehicle in which Thompson's body was later recovered bore a license plate of 046-WFH.) Matthews returned to the hotel, where the mattress had been pulled off the bed. She waited for police to arrive. When the police arrived they questioned her in the hotel room. As they were questioning her, she heard a report on a police radio that shots had been fired in the area. She concluded that the shooting likely involved Thompson.

She went with police around the corner and saw the vehicle that Thompson had been placed in, parked, with one of the doors open. She saw Thompson slumped in the back seat. She went to the hospital when Thompson was taken there by ambulance and was told that he was dead on arrival. Although Matthews failed to identify Bell in a lineup, testimony regarding a lineup was not elicited at trial.

Police Officer Kevin Clark testified that he was working undercover on the night of the shooting. He heard a gunshot. He and his partner drove in the direction of the gunshot. They came upon a light-colored vehicle with its driver's side door open. Officer Clark observed a black male attempting to steer the vehicle to the curb. The man saw Officer Clark, hollered something into the vehicle and he and two additional men fled. Officer Clark observed a man lying in the back seat of the car, who was later determined to be Thompson. His partner chased the fleeing men, but was unable to apprehend them. Officer Clark was unable to identify any of the men.

Mark Sylvertooth provided the only testimony placing Bell at the shooting. He identified Bell as the shooter. Sylvertooth testified that, on the night of September 22, he, Bell, Mims, and a man known as "Otto" went to Thompson's motel room. He testified that he and Bell broke into the motel room and grabbed Thompson. Mims subsequently severely beat Thompson. Mims left the vehicle and was not present during the shooting. Otto, Bell and Sylvertooth took Thompson to a dark viaduct where Bell shot Thompson. Sylvertooth testified pursuant to two deals with the prosecutor. The first provided a ten year minimum sentence in exchange for his testimony against Bell's co-defendant, Mims. The second, revised deal provided for a 7-1/2 year minimum sentence in exchange for his testimony against Bell.

No witnesses were presented for the defense.

## II. Procedural History

Following a joint bench trial in Recorder's Court for the City of Detroit with co-defendant Bobby Mims, Bell was convicted of first-degree premeditated murder, first-degree felony murder, kidnapping, and felony firearm. On July 3, 1989, Bell was sentenced to life imprisonment without parole on each murder conviction, to be served consecutively to two-years' imprisonment for the felony-firearm conviction. He was not sentenced on the kidnapping conviction because it was the predicate felony for the felony-murder conviction. The first-degree premeditated murder sentence was vacated on double jeopardy grounds.

Bell filed an appeal of right in the Michigan Court of Appeals raising a claim that counsel was ineffective in failing to interview and present two alibi witnesses and failing to demand production of witness Durone Jenkins.[1] Bell also filed a motion to remand for a hearing on the claim that trial counsel was ineffective. The Michigan Court of Appeals granted the motion to remand for an evidentiary hearing on Bell's ineffective assistance of counsel claim. *People v. Bell*, No. 120770 (Mich. Ct. App. Apr. 23, 1990).

---

[1] Durone Jenkins was interrogated on January 12, 1989 in connection with the murder. Jenkins gave a statement in which he admitted to being the driver of the vehicle involved in the murder (although he denied knowing Thompson's name). He stated that he, "Oddie Dotty," "Tone," and "Mark" were in the vehicle, "Tone" and "Mark" entered the motel room and returned with a naked man who they tossed in the back of the car. Jenkins stated that he dropped "Oddie Dotty" at his girlfriend's house before the shooting. Jenkins did not testify at Bell's trial, nor was he charged in connection with Thompson's murder.

5

The trial court conducted an evidentiary hearing on May 31, 1990. At the conclusion of the evidentiary hearing, the trial court issued its finding that trial counsel was not ineffective.

The matter was then returned to the Michigan Court of Appeals, which affirmed Bell's convictions. *People v. Bell*, No. 120770 (Mich. Ct. App. Sept. 2, 1992).

Bell filed an application for leave to appeal to the Michigan Supreme Court, presenting two claims: (i) trial counsel was ineffective in failing to: interview and present two alibi witnesses, move for a separate trial, move for a change of venue, and investigate and prepare a defense; and (ii) the trial court improperly reviewed and referenced the preliminary examination transcript during the prosecution's cross-examination of a witness. The Michigan Supreme Court denied leave to appeal. *People v. Bell*, 442 Mich. 877 (Mich. March 29, 1993).

On October 31, 2006, Bell filed a *pro se* petition for writ of habeas corpus in this Court, raising the following claims:

I.      Conspiracy of my former trial counsel and state prosecutor to deprive me of my Sixth Amendment right to present witnesses, alibi witnesses, etc.

II.     Petitioner's imprisonment also resulted from perjured testimony, knowingly used by the state to obtain his conviction.

III.    The trial court, Judge Baxter, conspired to deprive Petitioner of a fair and impartial *Ginther* hearing.

IV. Petitioner was denied the effective assistance of appellate counsel where both appellate counsels were a part of the conspiracy.

Respondent filed a motion to dismiss on the ground that the petition was not timely filed. Bell responded that the limitations period should be tolled because he is actually innocent. On December 19, 2007, the Court granted Bell's Motion for Appointment of Counsel, appointing the Federal Defender Office to represent Bell and to investigate and prepare a brief regarding Bell's actual innocence claim and any other issues pertinent to the resolution of the petition. The Court also denied without prejudice Respondent's Motion to Dismiss for Failure to Comply with the Statute of Limitations pending receipt and consideration of supplemental briefs.

Bell, through counsel, filed a "Motion for Leave to Amend *Pro Se* Petition for Writ of Habeas Corpus and to Stay Federal Habeas Proceedings" (Motion to Amend and Stay). In the Motion to Amend and Stay, Bell's counsel stated that, through his investigation of claims relevant to the petition, he discovered material evidence relevant to Bell's defense and habeas petition which previously had been withheld from Bell. Bell sought leave to amend his petition to include a claim that the state violated *Brady v. Maryland*, 373 U.S. 83 (1963), and a stay of further habeas proceedings while Bell returned to state court to exhaust his unexhausted *Brady* violation claim. The Court granted the Motion to Amend and Stay.

Bell filed a motion for relief from judgment in the trial court, raising the following claim:

> The prosecution's failure to disclose material exculpatory evidence pertaining to William Stubblefield a.k.a. Willie King a.k.a. "Chilly Will," the prime suspect in this murder investigation, violated Mr. Bell's due process rights under *Brady v. Maryland*, as the evidence was reasonably likely to change the outcome of this very closely contested trial.

The State did not respond to the motion and the trial court did not hold an evidentiary hearing or hear oral argument. The trial court denied the motion. *People v. Bell*, No. 89-003844 (Wayne County Circuit Court May 7, 2009).

Bell filed an application for leave to appeal in the Michigan Court of Appeals. The State did not file a response. The application for leave to appeal was denied. *People v. Bell*, No. 292248 (Mich. Ct. App. Sept. 3, 2009). Bell filed an application for leave to appeal in the Michigan Supreme Court. Again, the State did not file a response. The application for leave to appeal was denied on February 26, 2010. *People v. Bell*, 778 N.W.2d 225 (Mich. 2010).

Bell then filed a Motion to Reopen the habeas corpus proceeding. The Court granted the Motion. The Court held an evidentiary hearing regarding Bell's *Brady* violation claim on November 8, 2010. The parties have submitted supplemental briefs regarding the *Brady* claim.

### III. Standard of Review

The petitioner's claims are reviewed against the standards established by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (AEDPA). As amended, 28 U.S.C. § 2254(d) permits a federal court to issue the great writ only if the state court decision on a federal issue "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or it amounted to "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) & (2); *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998). Mere error by the state court will not justify issuance of the writ; rather, the state court's application of federal law "must have been objectively unreasonable." *Wiggins*, 539 U.S. at 520-21 (*quoting Williams v. Taylor*, 529 U.S. 362, 409 (2000) (internal quotes omitted)). Additionally, this Court must presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.").

The Supreme Court has explained the proper application of the "contrary to" clause as follows:

> A state-court decision will certainly be contrary to [the Supreme Court's]
> clearly established precedent if the state court applies a rule that contradicts
> the governing law set forth in our cases. . . .
>
> A state-court decision will also be contrary to this Court's clearly
> established precedent if the state court confronts a set of facts that are
> materially indistinguishable from a decision of this Court and nevertheless
> arrives at a result different from [the Court's] precedent.

*Williams*, 529 U.S. at 405-06.

The Supreme Court held that a federal court should analyze a claim for habeas

corpus relief under the "unreasonable application" clause of § 2254(d)(1) "when a

state-court decision unreasonably applies the law of this Court to the facts of a prisoner's

case." *Id*. at 409. The Court defined "unreasonable application" as follows:

> [A] federal habeas court making the "unreasonable application" inquiry
> should ask whether the state court's application of clearly established
> federal law was objectively unreasonable. . . .
>
> [A]n unreasonable application of federal law is different from an incorrect
> application of federal law. . . . Under § 2254(d)(1)'s "unreasonable
> application" clause, then, a federal habeas court may not issue the writ
> simply because that court concludes in its independent judgment that the
> relevant state-court decision applied clearly established federal law
> erroneously or incorrectly. Rather, that application must also be
> unreasonable.

*Id*. at 409, 410-11; *see also Knowles v. Mirzayance*, --- U.S. ----, ----, 129 S. Ct. 1411,

1419 (2009) (noting that the Supreme "Court has held on numerous occasions that it is

not " "an unreasonable application of clearly established Federal law" " for a state court

to decline to apply a specific legal rule that has not been squarely established by this

Court") (*quoting Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008) (per curiam));

*Murphy v. Ohio*, 551 F.3d 485, 493-94 (6th Cir. 2009); *Eady v. Morgan*, 515 F.3d 587,

594-95 (6th Cir. 2008); *Davis v. Coyle*, 475 F.3d 761, 766-67 (6th Cir. 2007); *King v.*

*Bobby*, 433 F.3d 483, 489 (6th Cir. 2006); *Rockwell v. Yukins*, 341 F.3d 507, 512 (6th

Cir.2003) (en banc).

## IV. Statute of Limitations

Respondent argues that all of Bell's claims are barred from review because the

petition was not filed within the applicable statute of limitations.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified

at 28 U.S.C. § 2241 et seq., became effective on April 24, 1996, and governs the filing

date for this action because Bell filed his petition after the AEDPA's effective date. *See*

*Lindh v. Murphy*, 521 U.S. 320, 336 (1997). The AEDPA includes a one-year period of

limitations for habeas petitions brought by prisoners challenging state court judgments.

The statute provides:

> (1) A 1-year period of limitation shall apply to an application for a writ of
> habeas corpus by a person in custody pursuant to the judgment of a State
> court. The limitation period shall run from the latest of-
>
> > (A) the date on which the judgment became final by the conclusion
> > of direct review or the expiration of the time for seeking such
> > review;
> >
> > (B) the date on which the impediment to filing an application
> > created by State action in violation of the Constitution or laws

of the United States is removed, if the applicant was
prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially
recognized by the Supreme Court, if the right has been newly
recognized by the Supreme Court and made retroactively applicable
to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims
presented could have been discovered through the exercise of due
diligence.

(2) The time during which a properly filed application for State
post-conviction or other collateral review with respect to the pertinent
judgment or claim is pending shall not be counted toward any period of
limitation under this subsection.

28 U.S.C. § 2244(d).

Bell's *Brady*-related claim is based upon a claim of newly-discovered evidence.

The newly-discovered evidence includes: a police report indicating that a man then-

known to police as Willie King, also known as "Chillie Will"and recently determined to

be William Stubblefield,[2] was arrested as a suspect in Thompson's murder;

King/Stubblefield's statement to police; and witness statements regarding

King/Stubblefield. The timeliness of the *Brady*-related claim is reviewed under §

---

[2] A Federal Defender Office investigator executed an affidavit dated 3/11/09 in
connection with this habeas proceeding and the state motion for relief from judgment stating that
he interviewed King's sister, who confirmed both that King was actually William Stubblefield
and that Stubblefield was deceased. King/Stubblefield's sister also noted that his nickname was
"Chilly Will." Additionally, the Michigan State Police's criminal-history records, attached as an
exhibit to Bell's Motion to Re-open, lists Willie King as an alias for William Stubblefield.

2244(d)(1)(D). That is, the limitations period commenced on the date on which the

factual predicate for Bell's *Brady* claim could have been discovered through the exercise

of due diligence.

Bell argues that he did not discover and could not have discovered the existence of

the *Brady* material until sometime in 2008 when the material was discovered by counsel

in connection with the pending habeas petition. When the state trial court denied Bell's

motion for relief from judgment, the trial court held that the King/Stubblefield-related

evidence was not newly discovered. The trial court held:

> As evidence that the prosecution suppressed the reports, defendant has
> provided a sworn affidavit in which he states that he was not aware of any
> police reports at the time of trial, and that his trial counsel had not
> mentioned the names Willie King or William Stubblefield. However, the
> affidavit does not conclusively establish that the prosecution withheld
> evidence or that trial counsel did not receive a copy of the reports during
> defendant's trial. Although defendant claims that trial counsel never
> mentioned the names King or Stubblefield, this does not warrant a
> conclusion that counsel never received the reports. Rather, it is just as
> possible that trial counsel received the reports yet did not mention these
> names to defendant.

*Bell*, slip op. at 4.

This Court owes deference to the trial court's decision unless it was contrary to or

an unreasonable application of Supreme Court precedent or an unreasonable

determination of the facts in light of the evidence. In light of the total record, the Court

finds that the state court's decision was an unreasonable determination of the facts in light

of the evidence. The evidence that these documents are newly discovered and could not have been previously discovered through the exercise of due diligence is substantial.

Bell's first court-appointed attorney in this habeas proceeding, James Gerometta,[3] testified at the evidentiary hearing in this Court that Respondent initially provided to him approximately fifty pages of documents from the homicide file. Gerometta determined that the homicide file was incomplete because it lacked any reports regarding a lineup in which Priscilla Matthews stated that Bell was not one of the individuals who kidnapped Thompson. In response to counsel's request, Respondent provided additional documents, including documents related to the lineup. Gerometta concluded that the materials provided were still incomplete and moved this Court for an Order requiring the Detroit Police Department to produce the entire, unredacted homicide file. Despite the Detroit Police Department's response to a 1994 FOIA request indicating that the homicide file related to Bell's case could not be located, the homicide file did exist, could be located, and the entire, unredacted homicide file consisted of hundreds of pages of documents. Gerometta testified that the unredacted homicide file contained a subfolder which

---

[3] Gerometta was appointed to represent Bell in this case in February 2008. He also represented Bell in state court for the filing of Bell's motion for relief from judgment. After representing Bell for over two years, Gerometta filed a motion to withdraw as counsel. Gerometta's representation of Bell was diligent, capable, and tireless, but not without its difficulties. By the time Gerometta filed his motion to withdraw it was clear that the attorney-client relationship could not continue in a productive way. Therefore, the Court granted the motion and appointed substitute counsel, while recognizing that Gerometta was a very effective advocate for his client.

consisted of approximately 50 pages. It appeared to Gerometta that these documents had been culled as the most relevant. Gerometta testified that, throughout his investigation of this case, he found no indication that the entire homicide file had ever been turned over to the defense. He discovered that defense counsel was deceased, the officers in charge of the homicide investigation could not verify what was disclosed to the defense from the homicide file, and the prosecutor had no specific recollection of what was turned over in this case.

Bell was represented by two attorneys on appeal, Daniel Rust and John Payne. Rust sent a letter to Bell on October 24, 1991, stating that a lineup was not conducted in Bell's case, supporting the conclusion that the entire homicide file was not produced to the defense. Payne informed Gerometta in a signed statement that he never saw the King/Stubblefield witness statement or arrest report during his representation of Bell. Bell stated in an affidavit that he never heard his attorney discuss King or Stubblefield. In addition, during trial, defense counsel did not question any of the witnesses regarding the lineup or the King/Stubblefield arrest report, which supports the argument that counsel had not been provided with the entire homicide file.

Respondent argues that Bell has not shown that the evidence was newly discovered or that he exercised due diligence in attempting to discover this evidence. In support of the argument that the evidence was not newly discovered, Respondent references a 2006

"Amended petition to file supplemental information in referred to original petition" for

clemency by Bell to Governor Granholm and attached to his habeas corpus petition.

Respondent refers to the following paragraphs from Bell's letter:

> Nowhere during the trial was the complaining witness, Mrs. Matthews,
> asked to give a detailed description of the perpetrator, as she provided in her
> original statement dated 9/23/1988 to Detective Sgt. Robt Gerde, she
> indicated Chilly Will was a B/M 5-10 160 real dark comp. short hair, must.
> She's known him about 3 years. *See Kyles v. Whitley*, 115 S. Ct. 1555
> (1995).
>
> See (G.H.T., 65-66) Defense Counsel Jay Nolan admitted in the *Ginther*
> hearing that these Detectives were witnesses. As Ms. Matthews also
> provided in her original statement (investigator's report) of Detective
> Butler, dated 9.24.1988, she (Mrs. Matthews) provided Detective Butler
> with names, addresses and description of all suspect[s] involved in the
> kidnapping of her boyfriend William Thompson.

8/31/06 Letter to Gov. Granholm at 5.

Respondent argues that the cited paragraphs show that the Chill Willy evidence

was not newly discovered and that several of the documents attached to the amended

petition were already in Bell's possession. At most, this document shows that Bell was in

possession of Matthews' original police statement, dated September 22, 1988, and an

investigative report by Detective Butler, dated September 24, 1988, at the time he sent the

August 31, 2006 letter. Notably, in the August 31, 2006 letter, Bell characterizes this

information as "newly discovered." Bell filed his habeas petition approximately two

months after the date of that letter. Respondent argues, however, that the limitations

period did not commence in August 2006 because Bell offers no explanation for the source of these documents, how long they were in his possession or why he would not have been able to locate them sooner through due diligence. This argument fails for two reasons.

First, even assuming its truth, there is additional later, newly-discovered evidence (most significantly, the evidence related to King/Stubblefield's arrest) from which the one-year limitation period would be triggered under § 2244(d)(1)(D). Second, the record shows that Bell exercised diligence in attempting to locate relevant evidence. Since the date of his conviction, Bell has maintained his innocence and sought to have his conviction overturned. Bell's efforts included, but were not limited to, filing several Freedom of Information Act requests seeking the Detroit Police Department homicide file and filing a grievance with the state Attorney Grievance Commission. In a 1994 affidavit in response to Bell's FOIA request, the Detroit Police Department Sergeant William Rice, submitted an affidavit stating that he was unable to locate any records related to the homicide file.

Bell's apparent failure to ask for the specific documents that form the basis for his newly-discovered evidence claim does not establish a lack of diligence. The Sixth Circuit Court of Appeals rejected a similar claim in *Willis v. Jones*, 329 F. App'x 7 (6th Cir. 2009). In *Willis*, several years after his conviction became final, the petitioner requested

records concerning his case. In response to his request, the State disclosed a record

containing *Brady* material that it had not disclosed prior to or at trial. The petitioner filed

a habeas petition which the State argued was untimely because the evidence could have

been discovered sooner. The State claimed that its willingness to turn over the *Brady*

material when finally asked by the petitioner proved that the material could have been

discovered sooner. The Sixth Circuit held that "due diligence did not require [the

petitioner] to ask the state if it had withheld *Brady* material unknown to him," because

such a requirement would be "fundamentally at odds with *Brady* itself." *Id.* at 9. Bell

inexhaustibly sought redress in state and federal court. He should not be faulted for

failing to specifically discover that which he did not know existed. The Court finds that

these additional documents could not have been discovered earlier. Therefore, the Court

concludes that Bell exercised diligence in attempting to discover all material relevant to

his case and that his *Brady* claim was timely filed.

The timeliness of Bell's other habeas claims is governed by § 2244(d)(1)(A),

which states that a habeas petition must be filed within one year of the date on which the

judgment became final. Prisoners, like Bell, whose convictions became final before the

AEDPA's effective date are given a one-year grace period in which to file their federal

habeas petitions. *See Jurado v. Burt*, 337 F.3d 638, 640 (6th Cir. 2003). In this case,

absent equitable tolling, the statute of limitations commenced for Bell's remaining claims

on the effective date of the AEDPA and continued to run until it expired on April 24,

1997.  Bell argues that actual innocence warrants equitable tolling.

The Sixth Circuit has held that a credible claim of actual innocence may equitably

toll the one-year statute of limitations set forth at 28 U.S.C. § 2244(d)(1).  *See Souter v.*

*Jones*, 395 F.3d 577, 588-90 (6th Cir. 2005).  To support a claim of actual innocence, a

petitioner in a collateral proceeding "must demonstrate that, in light of all the evidence, it

is more likely than not that no reasonable juror would have convicted him." *Bousley v.*

*United States*, 523 U.S. 614, 623 (1998) (*quoting Schlup v. Delo*, 513 U.S. 298, 327-28,

(1995)).  A valid claim of actual innocence requires a petitioner "to support his

allegations of constitutional error with new reliable evidence – whether it be exculpatory

scientific evidence, trustworthy eyewitness account, or critical physical evidence – that

was not presented at trial." *Schlup*, 513 U.S. at 324.  "The *Schlup* standard is demanding

and permits review only in the 'extraordinary' case." *House v. Bell*, 547 U.S. 518, 538

(2006) (citation omitted).  A court presented with new evidence must consider it in light

of "all the evidence, old and new, incriminating and exculpatory, without regard to

whether it would necessarily be admitted under rules of admissibility that would govern

at trial." *Id.*, 547 U.S. at 538 (citation omitted).  "Based on this total record, the court

must make 'a probabilistic determination about what reasonable, properly instructed

jurors would do.'"  *Id*. (*quoting Schlup*, 513 U.S. at 329).  This standard does not require

absolute certainty about the petitioner's guilt or innocence:

> A petitioner's burden at the gateway stage is to demonstrate that more likely
> than not, in light of the new evidence, no reasonable juror would find him
> guilty beyond a reasonable doubt – or, to remove the double negative, that
> more likely than not any reasonable juror would have reasonable doubt.

*House*, 547 U.S. at 538.

Bell's newly-discovered evidence in support of his claim of actual innocence

includes an arrest report for Willie King, King's custodial statement, and information

regarding King's true identity, nickname, and place of residence.  First, the arrest report

shows that Willie King, also known as "Chilly Will," was arrested on January 24, 1989

for the murder of William Thompson.  King is described as wearing a black jacket similar

to that described by Matthews as having been worn by Chilly Will.  King's address was

recorded as 2629 Clairmount, only three streets from Gladstone, the area where Matthews

stated she met "Chilly Will."  The arresting officer's report indicates that King lived one

block away from where the murder suspect had last been seen fleeing the scene.  The

report also indicates that King fit the physical description of the suspect and that his

vehicle had the words "Chilly Willie" painted on the side.  Additionally, a witness

interviewed by police in the investigation of King, Dimitri Williams told police that he

had seen King with a .38 caliber short barrel weapon.  The murder weapon was a .38

caliber weapon.

King's custodial statement listed him as weighing 135 pounds and being 5'6" tall. King admitted to knowing Mims and Thompson. He claimed to have last seen Mims in the summer of 1988. He denied knowing William Thompson by name, but admitted knowing someone named "Herk", Thompson's nickname. He knew Herk from when they were incarcerated together, but claimed to have last seen "Herk" in 1985. He denied knowing Sylvertooth and claimed not to recognize his photograph. The statement does not reflect that King was questioned about the murder investigation specifically or whether he knew Priscilla Matthews. There is also no indication that Matthews was asked to identify King.

This Court must decide whether the new evidence of the existence of an actual person known as "Chilly Will," who lived in close proximity to the location where Matthews said "Chilly Will" lived, and who was arrested as a suspect in this crime, together with the evidence presented at trial, and the evidence of alibi witnesses not presented at trial, establishes that it is more likely than not that no reasonable juror would have found Bell guilty beyond a reasonable doubt. The Court finds that it does.

The evidence against Bell was not strong. He was implicated in the crime by only one witness at trial, Mark Sylvertooth. Sylvertooth was clearly not without interest in implicating Bell. He secured a plea agreement for his testimony against Mims and a further reduction in a separate agreement for testimony against Bell. By identifying Bell,

rather than himself, as the shooter, Sylvertooth provided information which made a favorable plea agreement for him significantly more likely.

Priscilla Matthews testified that Bell was not one of the men who kidnapped Thompson. Her testimony in this regard was consistent and unwavering throughout. In addition, her other testimony regarding certain details of the crime have proven reliable. For example, her recitation of the license plate was very similar to the actual license plate. Her description of the perpetrators was very similar to the description given by the officers who saw the men fleeing from the vehicle. Matthews' detailed description of a CD she saw in the crime vehicle was consistent with that found by police. Moreover, Bell presented two witnesses at the state-court *Ginther* hearing who testified that he was with them at the time of the shooting.

The Court finds that the foregoing evidence creates a compelling case of actual innocence. Therefore, the limitations period is equitably tolled and the Court may consider the merits of Bell's claims.[4]

---

[4]Thus, Bell's *Brady* claim was timely as discussed above. However, if that discussion is wrong, then the actual innocence claim tolls the limitations.

## V.  Discussion

## A.  Brady Violation

Bell argues that he is entitled to habeas corpus relief because the prosecutor

violated *Brady v. Maryland*, 373 U.S. 83 (1963), when he failed to produce relevant,

exculpatory documents from the Detroit Police Department homicide file.

In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court established that

a prosecutor's failure to disclose evidence favorable to the defense constitutes a denial of

due process "where the evidence is material either to guilt or to punishment, irrespective

of the good faith or bad faith of the prosecution."  To demonstrate a *Brady* violation, a

habeas petitioner must establish the following three elements: "The evidence at issue

must be favorable to the accused, either because it is exculpatory, or because it is

impeaching; that evidence must have been suppressed by the State, either willfully or

inadvertently; and prejudice must have ensued."  *Strickler v. Greene*, 527 U.S. 263, 281-

82 (1999).  There are three components of a *Brady* violation: "The evidence at issue must

be favorable to the accused, either because it is exculpatory, or because it is impeaching;

that evidence must have been suppressed by the State, either willfully or inadvertently;

and prejudice must have ensued."  *Id.*

The *Brady* material is discussed at length *supra* in the Court's discussion of the

statute of limitations.  In sum, the exculpatory evidence consists of reports from the

Detroit Police Department's homicide file pertaining to the arrest of William Stubblefield, also known as Willie King and Chilly Will. Bell argues that these reports strongly corroborate Matthews' testimony that Mr. Bell was not involved in the kidnapping and murder of Thompson.

The trial court, in its order denying Bell's motion for relief from judgment, found no *Brady* violation. Regarding the first element, the trial court did not specifically address whether the evidence was favorable to the accused. Instead, the trial court assumed the evidence was favorable, but found no *Brady* violation because Bell failed to establish prejudice. Because the state court failed to address this prong, the Court owes the court no deference. The evidence in this case was favorable to Bell because it showed that the suspect described by Matthews as Chilly Will was an actual person, whose physical description fit that given by Matthews, who lived in the relevant neighborhood, and who was known to carry the same caliber weapon as that used in the murder. Thus, the Court finds that the evidence was favorable.

With respect to *Brady's* second prong, the trial court held that Bell failed to establish that the prosecution suppressed the police reports. The state court found Bell's affidavit that his trial counsel had not mentioned the names Willie King or Willie Stubblefield insufficient to establish that the State suppressed the police reports. The trial court concluded that Bell's affidavit did not "warrant a conclusion that counsel never

received the reports.  Rather, it is just as possible that trial counsel received the reports yet

did not mention those names to the defendant."  *Bell*, slip op. at 4.  The trial court fails to

mention any evidence other than Bell's affidavit in finding that the reports were not

suppressed.  She does not address the failure of trial counsel to introduce these documents

into evidence or to cross-examine any witnesses about the arrest of an individual whose

appearance was consistent with Matthews' description of "Chilly Will."  It would be an

error of tremendous magnitude for a trial attorney to have failed to present this evidence

had it been available to him.[5]  The trial court also did not consider appellate counsel

Rust's letter incorrectly noting that a lineup was not conducted in Bell's case.  The notes

in the suppressed file referred to the lineup.  The trial court did not address the manner in

which the documents were maintained in the homicide file, that is, that a small subset of

documents were separated from the remainder of the police file.  The Detroit Police

Department responded to a FOIA request in 1994 by stating that the Detroit Police

Department homicide file could not be located.  Over a decade later, the file was located

---

[5]  To the extent that these documents were, in fact, produced to defense counsel, Bell has a substantial claim that trial counsel was ineffective in failing to place these documents into evidence at trial.  The Court will not order supplemental briefing on this issue at this time.  Mr. Bell has been incarcerated since 1989.  His conviction was rendered in violation of *Brady* and he presents a significant claim of actual innocence.  Mr. Bell has diligently pursued justice in his case for far too long.  The Court finds that the interests of justice are best served by not delaying a decision in this case any longer.  Therefore, the Court will not address the effectiveness of counsel with respect to these documents at this time.  However, the Court's decision not to address this issue is not a decision on the merits.

in connection with this habeas proceeding, indicating the degree of diligence and care

befitting maintenance of a murder investigation file was not satisfied in this case.  Finally,

the prosecutor's file, which may have provided some insight into what was produced, was

destroyed by the prosecutor's office.  Given the foregoing, the Court finds that the state

court's decision that the material was not suppressed is unreasonable.

Lastly, Bell must show that the evidence was material.  "[F]avorable evidence is

material, and constitutional error results from its suppression by the government, 'if there

is a reasonable probability that, had the evidence been disclosed to the defense, the result

of the proceeding would have been different.'"  *Kyles v. Whitley*, 514 U.S. 419, 433

(1995) (*quoting United States v. Bagley*, 473 U.S. 667, 682 (1985)).

> The question is not whether the defendant would more likely than not have
> received a different verdict with the evidence, but whether in its absence he
> received a fair trial, understood as a trial resulting in a verdict worthy of
> confidence.  A "reasonable probability" of a different result is accordingly
> shown when the government's evidentiary suppression "undermines
> confidence in the outcome of the trial."

*Kyles*, 514 U.S. at 434 (*quoting United States v. Bagley*, 473 U.S. 667, 678, (1985)).

The trial court held that Bell failed to establish a reasonable probability that the

outcome of the proceedings would have been different had the police reports been

disclosed.  The trial court reasoned as follows:

> [T]here were only two witnesses who identified the perpetrators.  The only
> significant difference in their testimony was that Matthews identified Chilly
> Will as one of the perpetrators, and S[y]lvertooth testified that it was not

Chilly Will, but defendant, who participated in the abduction and murder of Thompson. Although defendant is correct that the police reports do tend to establish that Chilly Will was a real person, they do not establish that it was Chilly Will, and not defendant, who committed the abduction and murder. On the contrary, in his interview with police, Chilly Will stated that he had not seen co-defendant Mims since the summer before, and then only saw him briefly in a passing car. Chilly Will also informed police that he had not seen Thompson since the two were in a prison together several years earlier, and that he was not at all familiar with S[y]lvertooth. Thus, rather than supporting Matthews' testimony that it was Chilly Will who broke into the hotel room and abducted Thompson, the police reports tend to establish that Chilly Will did not participate in the abduction and murder of Thompson.

*Bell*, slip op. at 4-5.

In other words, the trial court's reasoning can be summed up as follows: Two witnesses, Sylvertooth and Matthews, testified about the identity of the perpetrator. Sylvertooth identified Bell, Matthews identified Chilly Will, who, she clearly and consistently stated, was not Bell. Chilly Will was interviewed by police and stated that he had not seen Mims since the previous summer, had not seen Thompson for several years, and did not know Silvertooth. Therefore, the trial court concluded, the police reports tend to exonerate Chilly Will.

Much like the police apparently did in their investigation of this crime, the trial court ignored or dismissed the information that did not inculpate Bell, including the following: Stubblefield's similarity to Matthews' description of Chilly Will; the absence of Matthews' potential bias in contrast to Sylvertooth's well-established fear of Mims and

the dual benefits to Sylvertooth of identifying Bell as the shooter: obtaining a plea

agreement and exonerating himself as the shooter; the police officer's failure to question

King/Stubblefield about the murder or his whereabouts on the date of the murder; the

failure to conduct a lineup with King/Stubblefield; and a witness statement indicating that

King/Stubblefield was known to carry the same caliber weapon as the murder weapon.

The trial court's reasoning – that a suspect's professed ignorance of a crime exculpates

him - is not the law.

In addition to supporting Matthews' testimony that Bell was not involved in

Thompson's murder, the suppressed evidence would have raised questions about the good

faith and thoroughness of the investigation. The police did not question

King/Stubblefield about his involvement in the crime or his whereabouts at the time of

the murder. The police did not conduct a lineup for Priscilla Matthews to determine

whether she would identify King/Stubblefield as the man she knew as "Chill Will." The

police also did not prosecute Durone Jenkins for his admitted involvement in the crime.

This information regarding the police investigation "would have revealed a remarkably

uncritical attitude on the part of the police," *Kyles*, 514 U.S. at 445, which could only

have served to bolster the defense.

In *Harris v. Lafler*, 553 F.3d 1028 (6th Cir. 2009), the Sixth Circuit Court of

Appeals found a *Brady* violation where the State failed to disclose promises made to a

key prosecution witness, Ward, in exchange for his testimony. Ward provided the only direct testimony inculpating the petitioner, Harris. The Court of Appeals held, in relevant part:

> That leaves us with a murder conviction in which Ward's testimony was the centerpiece of the prosecution's case, the State submitted no other evidence directly linking Harris to the crime, Harris presented a witness who denied that he was at the scene of the crime and Harris had no basis (other than the suppressed *Brady* material) for meaningfully impeaching Ward's credibility. Under these circumstances, it is exceedingly plausible that the disclosure of these three promises would have cast Ward's testimony, and thus all of the prosecution's case, in a different light – so different, indeed, that it undermines our confidence in the conviction and so different that the state court of appeals' contrary conclusion represents an unreasonable application of *Brady*.

*Id.* at 1034.

Sylvertooth's testimony was the only piece of evidence directly linking Bell to the crime. Matthews testified Bell was not the person she saw in the hotel room. No other evidence was presented directly linking Bell to the crime; neither was any physical or forensic evidence doing so presented. Moreover, presentation of the *Brady* material at trial would have prompted any reasonable juror to question the diligence of the police department's investigation of the crime. In the pending case, it is "exceedingly plausible" that disclosure of the police reports would have cast the prosecution's case in a different light. The Court finds that there is a reasonable probability (if not certainty) that the

outcome of Bell's trial would have been different had the reports been produced and the state court's contrary finding is an unreasonable application of *Brady*.

### B. Ineffective Assistance of Trial Counsel

Bell also claims that habeas relief is warranted because his trial counsel was ineffective in failing to investigate and call two alibi witnesses, Ruth Overton and Dewaylia Bogan. Respondent argues that this claim is unexhausted because Bell failed to raise it in his motion for relief from judgment and, consequently, also procedurally defaulted because no available state remedy exists. This ineffective assistance of counsel claim was raised on direct review in the Michigan Court of Appeals and Michigan Supreme Court. Thus, Bell did not need to raise it in his state motion for relief from judgment and it is properly exhausted.

To establish that he received ineffective assistance of counsel, a petitioner must show, first, that counsel's performance was deficient and, second, that counsel's deficient performance prejudiced the petitioner. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A petitioner may show that counsel's performance was deficient by establishing that counsel's performance was "outside the wide range of professionally competent assistance." *Id.* at 689. This "requires a showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687.

To satisfy the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. A court's review of counsel's performance must be "highly deferential." *Id.* at 689. Habeas relief may be granted only if the state-court decision unreasonably applied the standard for evaluating ineffective-assistance-of-counsel claims established by *Strickland*. *Knowles v. Mirzayance*, __ U.S. __, 129 S. Ct. 1411, 1419 (2009). "The question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable – a substantially higher threshold." *Id.* at __, 129 S. Ct. at 1420 (internal quotation omitted).

Bell argues that his defense attorney should have called two alibi witnesses Dewaylia Bogen, Bell's girlfriend, and Ruth Overton, Bogen's mother. On remand from the Michigan Court of Appeals, the trial court conducted an evidentiary hearing pursuant to *People v. Ginther*, 390 Mich. 436 (1973), regarding this claim. At the evidentiary hearing, trial counsel testified that Bell informed him only of Dewaylia Bogen as a potential alibi witness and he filed an alibi notice accordingly. Defense counsel's testimony regarding whether he interviewed or contacted Bogen prior to trial was inconsistent: he testified both that he specifically did not take any steps to contact Bogen

31

and that it was his practice to do so, though he had no specific recollection of what he did in this case. At one point, defense counsel reasoned "[Bell] said he would produce her, she would be here at trial date and I indicated I would talk with her at that occasion, after the – well, I'm not sure if I indicated to him, I think I did, it would be after the prosecution's proofs." Tr., 5/31/90, 15. Defense counsel did not subpoena Bogen. Defense counsel testified that the witnesses were either in the hallway during the trial or on standby and that, when the trial commenced, he and Bell had not yet decided whether the alibi witnesses would be needed. Defense counsel claimed that the first time he was aware of Overton as a potential alibi witness was when Bell filed a grievance against him after having been convicted. Yet, defense counsel also testified that the alibi witnesses (plural) were either in the hallway or on standby during trial.

Defense counsel testified that at the close of the prosecution's case, he advised Bell that it would not be prudent to have Bogen testify. Matthews had given testimony favorable to Bell because she affirmatively testified he was not one of the perpetrators. Defense counsel believed that Bogen's testimony might dilute Matthews' favorable testimony. Despite not remembering ever having spoken to Bogen, defense counsel remembered telling Bell he should not run the risk of calling an obviously interested witness who the prosecutor might "tear up" on cross-examination and that his experience was that alibi witnesses rarely held up. *Id.* at 47.

Bogen and Overton both testified at the *Ginther* hearing. Overton testified that her daughter, Bogen, was Bell's girlfriend. Bell was living in her home at the time of the murder. Overton testified that defense counsel never contacted or subpoenaed her. Bell had told her that she would be advised of the trial date, but she was not. Overton was not present in the courthouse on the day of trial. If she had been called to testify, she would have testified that, on September 22, 1988, Bell came home at approximately 1:15 p.m. Overton went to bed at approximately 11:00 p.m. Between 1:15 p.m. and the time she went to bed, Bell did not leave the house.

Bogen testified that, at the time of the murder, she and Bell were in a relationship, but the relationship ended after he was arrested. Bogen was never contacted by defense counsel, nor was she subpoenaed. She testified that if she had been called as a witness at trial, she would have testified that Bell was home with her on the day of the murder. He did not leave the house. She and Bell went to bed at approximately 11:30 p.m. and she was not aware of him leaving the house after that.

Following the evidentiary hearing, the trial court concluded that counsel was not ineffective. The trial court was persuaded that it was reasonable trial strategy not to call the alibi witnesses because Priscilla Matthews had given favorable testimony, the alibi witnesses were interested parties based on their relationships with Bell, and the prosecutor would have attacked their credibility as obviously interested witnesses.

The Court of Appeals denied this claim without providing any reasoning.[6]  A federal habeas court affords "modified AEDPA deference" whenever state courts adjudicate claims on the merits without articulating their reasoning.  *Miller v. Stovall*, 608 F.3d 913, 928 (6th Cir. 2010), *citing Harris v. Stovall*, 212 F.3d 940, 943 & n. 1 (6th Cir. 2000).  "In such cases, a habeas court must focus on the *result* of the state court's decision, and uphold the state court's summary decision unless the habeas court's independent review of the record and pertinent federal law persuades it that the state court's result contravenes or unreasonably applies clearly established federal law as expressed in the holdings of the United States Supreme Court."  *Id.* at 928-29 (internal quotations omitted, emphasis in *Miller*).

Bell must overcome the presumption that, "under the circumstances, the challenged action 'might be considered sound trial strategy.'"  *Strickland*, 466 U.S. at 689 (*quoting Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).  In this case, counsel's failure to call two alibi witnesses is objectively unreasonable.  The Sixth Circuit Court of Appeals has held that a decision not to call an alibi witness based upon the alibi witness's close

---

[6]  The following is the state court's discussion of this issue, in its entirety,

Having reviewed the record, we find that defendant Bell has failed to establish a claim of ineffective assistance of counsel.  *People v. Tommolino*, 187 Mich. App. 14, 17; 466 N.W.2d 315 (1991).

*Bell*, slip op. at 1.

relationship with the defendant is not sound trial strategy because the it is the nature of alibi witnesses that they typically have some sort of a relationship with the defendant. *Poindexter v. Booker*, 301 F. App'x 522, 529 (6th Cir. 2008). Defense counsel did not forego the alibi defense in favor of a better defense. The alibi witnesses' testimony would have been consistent with Matthews' testimony that Bell was not "Chilly Will." Defense counsel's reliance on his client's ability to secure the presence of alibi witnesses, when Bell remained incarcerated pending trial with restricted access to the outside world was unreasonable. Moreover, even if the prosecutor had cross-examined the witnesses on their relationship with Bell and their presumed motive to exonerate Bell, this cross-examination would not reasonably impact the assessment of Matthews' credibility. Failure to call two alibi witnesses is therefore objectively unreasonable, and the state court's decision to the contrary was an unreasonable application of *Strickland*.

The Court next considers whether this claim satisfied the prejudice prong of *Strickland*. To establish prejudice, Bell must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

> A reasonable probability is a probability sufficient to undermine confidence in the outcome, ... but something less than a showing that the outcome more likely than not would have been different .... While the petitioner need not conclusively demonstrate his actual innocence, ... the focus should be on whether the result of the trial was fundamentally unfair or unreliable . . .

*Stewart v. Wolfenbarger*, 468 F.3d 338, 360 (6th Cir. 2006)*, quoting Bigelow*, 367 F.3d at 570 (additional internal quotation marks and citations omitted).

In this case, one witness implicated Bell as the shooter. Many other pieces of evidence, those presented and not presented, would have supported a finding that Bell was not the shooter. The Court will not repeat its discussion of the many pieces of evidence implicating Chilly Will, not Bell, as the shooter as those already have been addressed at length. The Court finds in light of all of that evidence, the testimony of two alibi witnesses, coupled with Matthews' testimony is sufficient to undermine the Court's confidence in Bell's conviction and the state court's holding to the contrary is an unreasonable application of *Strickland*.

## VI.  Conclusion

The Court finds that Bell's rights under *Brady v. Maryland*, were violated and that he received ineffective assistance of counsel and that the state court's findings to the contrary were an unreasonable application of *Brady* and *Strickland v. Washington*. Accordingly, **IT IS ORDERED** that the petition for a writ of habeas corpus is **CONDITIONALLY GRANTED**. Because the Court concludes that the *Brady* and ineffective assistance of counsel claims are each sufficient to warrant habeas corpus relief, the Court need not address Bell's remaining claims.

Unless a date for a new trial is scheduled within 120 days, Petitioner Bell must be unconditionally released.

**SO ORDERED**.


S/Arthur J. Tarnow
Arthur J. Tarnow
Senior United States District Judge

Dated: December 28, 2010


I hereby certify that a copy of the foregoing document was served upon counsel of record on December 28, 2010, by electronic and/or ordinary mail.

S/Catherine A. Pickles
Judicial Secretary